E-FILED
Thursday, 10 June, 2021  11:39:49 AM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

SHERRY L.H.,
     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
     Defendant.

Case No. 1:20-cv-01119-JES-JEH

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 15) and the Defendant's Motion for Summary Affirmance (Doc. 19). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Sherry L.H. filed an application for disability insurance benefits (DIB) on January 24, 2017, alleging disability beginning on November 24, 2013. Her DIB claim was denied on July 10, 2017 and upon reconsideration on September 25, 2017. Sherry filed a request for hearing concerning her DIB application which was held on October 23, 2018 before the Honorable Robert V. Luetkenhaus (ALJ). At the hearing, Sherry was represented by an attorney, and Sherry and a vocational expert (VE) testified. At that time, Sherry amended her alleged onset date to

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Docs. 9, 10, 11) on the docket.

August 16, 2016. Following the hearing, Sherry's claim was denied on January 30, 2019. Her request for review by the Appeals Council was denied on January 28, 2020, making the ALJ's Decision the final decision of the Commissioner. Sherry timely filed the instant civil action seeking review of the ALJ's Decision on March 24, 2020.

## II

At the October 2018 hearing, Sherry was 52 years old and lived with her adult daughter and three-year-old granddaughter. Sherry testified that her niece rode in the car with her to the hearing as Sherry did not drive alone if she were going somewhere with which she was unfamiliar. Sherry was a high school graduate who previously ran the bar her parents owned. On her Form SSA-3368, Sherry stated that the following conditions limited her ability to work: fibromyalgia; persistent depressive disorder with current major episode; anxiety and panic attacks; chronic pain; non-alcohol related stage 4 liver cirrhosis; obstructive sleep apnea; spondylosis lumbar spine; lumbar disc herniation, multi; myofascial pain syndrome HTN hypertension; and long term current use of opiate analgesic. AR 223. At the hearing, Sherry testified that what kept her from working was back and joint pain, "[b]eing confused," she dropped things, her balance was off, and her knees and ankles swelled if she were on them too long. AR 68-69.

Sherry testified that her diagnosis of neuropathy in the legs was a recent diagnosis and the neuropathy caused a stinging, "on fire" sensation. AR 71. Her anxiety caused her to get worked up to where she could not think or breathe, and it could happen at any time and anywhere. She said she had panic attacks at least once a day, and the medication she took for those calmed her down. The epidural steroid injections she received in her lower back helped "years ago" when she first started receiving them but, more recently, they did not do "anything" for her. AR 75. She said she dropped things as it felt like she was not holding onto anything.

2

Sherry also testified that she had the problem of getting lost a lot while driving, so she only drove to places she had to go like doctors' appointments. She said she could walk or stand for 10 minutes, she could sit a bit longer, and she could lift and carry a gallon of milk. Some of her medications made her drowsy, though one kept her awake. Her daughter did the house chores and grocery shopping. Sherry spent a typical day sleeping and sitting, feeling depressed. She did not babysit her granddaughter who lived with her.

Upon questioning by her attorney, Sherry testified that her anxiety had become worse so she was taking Xanax "probably" every other day or every two days. AR 81. She took oxycodone for pain relief every day, but it no longer provided her relief beyond taking the edge off. She had trouble sleeping, though she spent "a lot" of the day in bed and took naps. AR 82. She had trouble being around other people. She had trouble getting dressed and took a bath or showered "[m]aybe" once a week. AR 84. She said she only remembered to take her medications in the morning, and she used pill compartments because of her forgetfulness in taking her medications. Sherry also said she sat during the day thinking "[a]bout not wanting to be here." AR 86. She said she was unable to play with her granddaughter.

The ALJ next asked the VE to consider a hypothetical individual who: was 50-52 years old with 12 years of education and the same past work as Sherry; retained the ability to do light work, but could only occasionally stoop; could frequently kneel, crouch, and crawl; could perform only simple, routine, and repetitive tasks; and could make only simple work-related decisions. The VE responded Sherry's past relevant work was semi-skilled and skilled and the ALJ was "talking about someone who's doing unskilled work activity." AR 94. The ALJ identified three light, unskilled jobs the hypothetical individual could perform. Those three jobs were still available for the hypothetical individual identified who

also could handle, finger, and feel only frequently. The VE identified different light, unskilled jobs for the hypothetical individual identified who could instead only occasionally handle, finger, and feel. One of those identified jobs would remain if the individual needed an additional unscheduled break for 15-20 minutes daily. None of the jobs would be available if the individual were off task more than 20 percent of the workday.

### III

At Step Two of the disability analysis, the ALJ determined Sherry had the following severe impairments: degenerative disc disease of the lumbar spine; fibromyalgia; obesity; depressive disorder; and anxiety disorder. AR 15. The ALJ detailed that while no specific trigger points were noted at a consultative physical examination, Sherry's rheumatology records supported the finding that her fibromyalgia was "severe." AR 16. He explained that DDS did not consider Sherry's cognitive impairment a discrete impairment where the nurse practitioner who conducted the evaluation assessed Sherry with cognitive impairment "likely secondary to multiple etiologies, including pain, fibromyalgia, polypharmacy, obstructive sleep apnea, depression, and anxiety; active severe depression; and polypharmacy (currently on narcotic pain medications, which could impact cognitive function)." AR 16 (citing AR 1016). The ALJ also pointed out that Sherry's May 2017 neuropsychological evaluation resulted in a diagnosis of multifactorial cognitive dysfunction. The ALJ adopted the DDS determination "regarding the cognitive issues, considering the issues or aspects of/from other impairments." *Id*. At Step Three, the ALJ concluded Sherry did not meet or medically equal Listing 1.04 (Disorders of the spine) where she did not have spinal arachnoiditis, straight leg raise testing had routinely been negative, and examinations routinely indicated normal motor function, sensation, and reflexes. The ALJ also concluded that even if there was a discrete neurocognitive disorder,

Listing 12.02 (Neurocognitive disorders) would not have been met or medically equaled as it relied upon the same "B criteria" as Listings 12.04 (Depressive, bipolar and related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders), and Sherry had only mild limitation in two broad areas of functioning and moderate limitation in the remaining two broad areas of functioning.

At Step Four, the ALJ made the following residual functional capacity (RFC) finding: "[T]he claimant had the [RFC] to perform light work as defined in 20 CFR § 404.1567(b) except no more than frequent kneeling, crouching, and crawling; no more than occasional stooping; performance of simple, routine, and repetitive tasks; and a requirement to make only simple work-related decisions." AR 23. After repeating Sherry's 2018 hearing testimony and the statements she made on several 2017 Disability Reports, the ALJ emphasized that because Sherry's date last insured was December 31, 2017, she had to establish disability on or before that date in order to be entitled to disability benefits. The ALJ then addressed the medical records dated between 2007 and June 2018, noting that medical records dated after December 31, 2017 were relevant "to the extent that the records provide insight into how the claimant functioned on or before her date last insured." AR 26. The medical records included several "rheumatology visit[s]," psychiatric evaluations, and psychotherapy sessions.

The medical records the ALJ discussed included those from Sherry's hospitalization in November 2016. Her primary care provider had sent her to the emergency room after Sherry reported worsening depression and suicidal thoughts; Sherry remained in the ER where she admitted she was suicidal and had a plan to overdose on sleeping pills until a bed became available in the psychiatric ward. At the time she was discharged, Sherry's cognition was grossly intact, her insight and judgment were fair, her fund of knowledge was intact, her memory was grossly intact, her perceptions were normal, and she was alert and oriented in

all spheres. The ALJ also detailed that Sherry participated in a partial hospitalization program from February 23, 2017 to March 8, 2017 with regular individual and group counseling sessions addressing anxiety and depression related to her health issues, financial issues, and her daughter's problems. She made mild progress and she appeared better able to manage her anxiety and depression symptoms. Thereafter, Sherry attended her first psychotherapy/counseling session.

At her April 2017 consultative psychological evaluation, Sherry reported she had been depressed for many years, that she saw a counselor weekly, and that her medication was effective. Her clothing was neat and clean and her hygiene appropriate, she displayed appropriate eye contact and normal speech, she was cooperative and followed instructions appropriately, and she easily gained a rapport with the evaluator. The clinical psychologist diagnosed persistent depressive disorder (per history) and unspecified anxiety disorder (per history). Sherry also underwent a neuropsychological evaluation in May 2017 which revealed, among other things, deficient performances on various measures of attention, memory functions were relatively stable, and severe depressive symptomatology. The neuropsychologist diagnosed major depressive disorder and multifactorial cognitive dysfunction and recommended regular psychotherapeutic and medication intervention and recommended Sherry have some oversight of complex activities such as managing finances and medications.

At her June 2017 consultative physical examination, Sherry was not in any acute distress and related well to the examination. She stated she had diffuse body pain due to fibromyalgia and a 25-year history of low back pain. Upon examination, there was no specific motor weakness or muscle atrophy, her sensation was intact, and she was tender all over with no specific trigger points due to fibromyalgia. At a November 2017 initial psychiatric evaluation, Sherry

reported her anxiety and depression had worsened because of her health problems. She said her agitation and irritability improved with counseling. She was alert and oriented in all spheres, she was cooperative and displayed normal speech and normal psychomotor activity, her mood was sad and her affect constricted, her thought processes were goal directed but circumstantial, but she refused to answer the questions testing her attention and concentration as well as her calculation ability and short-term recall. She was diagnosed with major depressive disorder, generalized anxiety disorder, panic disorder, and insomnia and told to take Xanax as needed.

Though a neurologist raised the possibility of left lower extremity peripheral neuropathy in June 2018 upon Sherry's reports of a two-year history of left leg numbness and an examination which revealed decreased sensation in the left leg, the neurologist stated a peripheral neuropathy workup was needed, but the "submitted medical records do not document further workup." AR 39. In May 2017, a State Agency psychological consultant opined Sherry had mild limitation in three of the broad areas of mental functioning and moderate limitation in the final area of concentration, persistence, or pace. That assessment was affirmed by a second State Agency psychological consultant in September 2017. In July and September 2017, State Agency medical consultants opined Sherry could perform light work with frequent kneeling, crouching, and crawling and occasional stooping, but was otherwise unlimited.

## IV

Sherry argues: 1) the RFC used by the ALJ was not supported by the evidence as Sherry's mental impairments were not appropriately addressed; 2) the RFC used by the ALJ was not supported by the evidence as Sherry's physical impairments were not appropriately addressed; and 3) the ALJ erred in assessing Sherry's credibility.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)      currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)      suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

3)      suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)      is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id*. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

In the instant case, Sherry claims error on the ALJ's part at Step Four.

## A

Sherry first takes issue with the ALJ's consideration of her mental impairments. She argues the ALJ did not address the two moderate limitations he found existed in the domains of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace where there were no specific limitations to address both of those moderate limitations. She further argues that the limitations to "simple, routine, and repetitive tasks; and a

9

requirement to make only simple work-related decisions" are insufficient to account for a claimant's mental limitations under Seventh Circuit precedent. Sherry also faults the ALJ for finding only "mild" limitation in the domain of the ability to adapt or manage oneself because, according to Sherry, "[y]ou are not managing your symptoms when you need to be hospitalized and then follow up with a partial hospitalization program 2 months later." Plf's MSJ (Doc. 15-1 at pg. 60). The Commissioner highlights that the only psychological experts to assess Sherry's functioning agreed with the ALJ's finding on her ability to concentrate, and Sherry's subjective account of mental limitations reasonably did not persuade the ALJ.

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). However:

> Even generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace so long as they adequately account for the claimant's demonstrated psychological symptoms found in the record.

*Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (unpublished opinion) (citing *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)); *see also Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("As a matter of form, the ALJ need not put the questions to the VE in specific terms – there is no magic words requirement"). For several reasons, Sherry has failed to show that in this particular case, the mental RFC which limited her to the performance of "simple, routine, and repetitive tasks; and a requirement to make only simple work-related decisions" was deficient.

First, the only medical sources who provided opinions on the extent of Sherry's mental limitations, State Agency psychologist Leslie Fyans, Ph.D. and State Agency psychologist Joseph Mehr, Ph.D., indicated that Sherry did not have

limitations in understanding and memory or adaption and was moderately limited in only her ability to carry out detailed instructions and her ability to maintain attention and concentration for extended periods. In the narrative section of the State Agency psychologists' forms, they explained the medical evidence of record suggested "the cognitive and attentional skills for simple one and two step task [sic] are intact. The client can sustain this across a work day and a work week." AR 110, 124. They further explained that Sherry's activities of daily living indicated she was capable of carrying out routine chores and tasks, her mental status was within normative limits, and her "adaptive and interpersonal and cognitive resources are capable of doing one and two step unskilled tasks." *Id*. The ALJ recited nearly verbatim those narrative portions of their opinions and explained that he "generally agree[d] with and adopt[ed] the state agency [RFC] assessments" where: Sherry's statements on her disability paperwork and at the hearing appeared to overstate the extent of her limitations during the relevant period; her attention and concentration were intact at multiple examinations; and the recommendation following her May 2017 neuropsychological evaluation was that she have some oversight of complex activities such as managing finances and medications, "not that she lacked the cognitive capacity to perform any or all mental activities." AR 39.

The State Agency psychologists' opinions that Sherry remained capable of one and two step unskilled tasks over the course of a work day and work week are certainly reflected in the ALJ's mental RFC finding, albeit with the omission of the words "one and two step." *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates [findings of limitations in concentration persistent, or pace] into an RFC determination"). Furthermore, the ALJ took the guess work out of how a limitation to "simple, routine, repetitive tasks" accounted for Sherry's moderate limitations

in understanding, remembering, or applying information and in concentration, persistence, or pace earlier in his Decision. *See Yurt*, 627 F.3d at 618 (reiterating that an ALJ "must provide a logical bridge between the evidence and his conclusions"). At Step Three, the ALJ cited the evidence which supported a moderate limitation in Sherry's ability to understand, remember, or apply information but also cited evidence in support of his finding that "outside of formal cognitive testing, the claimant did not display significant memory or cognitive deficits" (e.g., Sherry had normal memory in October 2016, she followed instructions appropriately at her April 2017 consultative psychological evaluation, she had normal memory in August and December 2017, and she was able to drive and follow instructions from her treatment providers) such that Sherry was capable of performing simple, routine, repetitive tasks. AR 20. Similarly, with regard to Sherry's concentration, persistence, or pace, the ALJ cited the evidence which supported a moderate limitation in that domain but also cited the evidence which evinced her ability to perform simple, routine, repetitive tasks (e.g., Sherry had no need to use prescribed Xanax to treat panic attacks in a few months as of September 2017, she babysat her two-year-old granddaughter in late 2016, she was busy caring for other family members as reported in October 2017, she followed instructions appropriately at a consultative psychological evaluation in April 2017).

Second, "moderate limitation" is defined as follows: a claimant's "functioning in an area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2). The Commissioner points out that "fair" is understood to mean "sufficient but not ample," "adequate," "reasonably good in kind, quality, or degree," and "average: neither good nor bad." Commissioner's MSA (Doc. 19-1 at pg. 5) (citing the definition of "fair" in various sources). The Commissioner accordingly argues that the finding of a moderate rating in concentration, persistence, or pace at Step Three

did not imply greater limitations than described in the ALJ's mental RFC. The Commissioner's argument is well taken; that the ALJ's mental RFC sufficiently accounted for Sherry's mental limitations is only bolstered by the general understanding of what "fair" means. The Seventh Circuit, after acknowledging the definition of "moderate limitation" and the Commissioner's comment that "fair" in ordinary usage does not mean bad or inadequate, observed that "a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) (finding the ALJ reasonably relied on the agency consultants' narrative RFC that the claimant could perform at a consistent pace particularly if he was engaged in simple, repetitive tasks because it was in fact consistent with the "moderate" checklist ratings in areas related to maintaining concentration and working at a constant pace).

Lastly, Sherry's arguments as to the ALJ's mental RFC finding amount to arguing that the ALJ improperly weighed the evidence of record. This is particularly so with regard to Sherry's contention that the ALJ's finding of "mild" limitations in Sherry's ability to adapt or manage herself as to her psychological symptoms was clearly not supported by the evidence and not addressed in the RFC. Though the Court may not reweigh the evidence, an ALJ must nevertheless sufficiently articulate his assessment of the evidence to assure the Court that he considered the important evidence and to enable the Court to trace the path of his reasoning. *Scott v. Barnhart*, 297 F.3d 589, 593, 595 (7th Cir. 2002). Here, the Court can easily trace the path of the ALJ's reasoning from the evidence to his finding of only "mild" limitation in Sherry's ability to adapt or manage herself.

At Step Three, the ALJ cited evidence that Sherry's daughter and granddaughter were in and out of her house and Sherry babysat her granddaughter for a while in late 2016, Sherry participated in a partial

13

hospitalization program, she started attending psychotherapy, and she stated in October 2017 she was busy caring for other family members. The ALJ also considered Sherry's own reports in 2017 that counseling was helpful and that it was stressful caring for her mother but she was coping appropriately. In light of such evidence, it was logical for the ALJ to conclude that, "While the claimant experienced some increased symptoms at times in relation to situational stressors, the claimant generally managed adequately." AR 22. The Court can likewise trace the path of the ALJ's reasoning from the cited evidence to his agreement with the State Agency psychologists' assessment of only "mild" limitation in Sherry's ability to adapt or manage herself; the psychologists explained that Sherry's "adaptive . . . and cognitive resources are capable of doing one and two step unskilled tasks." AR 107, 110, 119, 120, 124. Moreover, it logically follows from the ALJ's finding that Sherry generally managed adequately and his agreement with the State Agency psychologists' explanation that Sherry had the adaptive resources making her capable of doing unskilled tasks that the mental RFC did not specifically address her "mild" limitation in adapting or managing herself.

Notably, the ALJ confronted the very evidence in his Decision to which Sherry points (her psychiatric hospitalization in November 2016, partial hospitalization in early 2017, neuropsychological testing in May 2017, her fibromyalgia, and a SSA claims representative's observations in September 2017) as support for her argument that the RFC failed to account for limitations in the domain of adapting or managing oneself. Her disagreement with the ALJ's consideration of this evidence is more appropriately considered in the context of Sherry's challenge to the ALJ's subjective symptom evaluation, which the Court addresses *infra*.

**B**

Sherry argues that the ALJ found she was not credible and did so by inserting a boilerplate paragraph, and the ALJ's statement and the remaining text of his Decision do not explain the weight given to Sherry's testimony. She specifically argues that she has significant physical findings and diagnostic results supporting her claim, the ALJ's Decision is not specific enough to counter findings by Sherry's treaters which support her testimony, the ALJ was cherry picking and using the "sound-bite" approach, and the credibility determination is not supported by the evidence in the record, especially at the hearing. The Commissioner counters that the ALJ extensively discussed Sherry's testimony as to extreme psychological limitations, the ALJ identified substantial evidence conflicting with Sherry's testimony that she does not challenge, the ALJ identified mental status exam results that reasonably conflicted with Sherry's testimony of extreme concentration difficulties, and the ALJ's assessment of Sherry's subjective complaints adequately considered her psychiatric hospitalizations, partial hospitalization, and reports of hospitalizations. As for Sherry's physical impairments, the Commissioner argues that Sherry presented no evidence of worse physical limitations than the RFC besides her own subjective complaints, the ALJ identified evidence that reasonably conflicted with her complaints of physical limitations, and Sherry's arguments regarding the ALJ's assessment of her physical functioning attempt to replace medical experts' unrefuted opinions with her say-so.

As an initial matter, the Court notes that "[t]he fact that the 'ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination.'" *Burmester*, 920 F.3d at 510 (quoting *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013)). The Commissioner's arguments precisely

illustrate that the ALJ's subjective symptom evaluation was proper and that the ALJ's Decision is supported by substantial evidence. SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms."[2] *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

After reading the Decision as a whole, the Court does not find that the ALJ engaged in cherry picking the evidence or otherwise engaged a "sound-bite" approach in his evaluation of Sherry's symptoms. His consideration of the objective medical evidence spanned 13 pages and included details such as Sherry's lumbar spine degenerative spondylosis and posterior disc extrusion, reduced range of lumbar spine and hip range of motion, recurrent episodes of major depressive disorder, persistent depressive disorder, mild obstructive sleep apnea, cognitive impairment, panic disorder, reduced range of motion of the right shoulder, bilateral knee crepitus, antalgic gait, 15 of 18 positive tender points, and generalized anxiety disorder. The objective medical evidence also provided Sherry's brain had no acute intracranial abnormality, she had normal coordination and reflexes, she had normal motor strength except for 4/5 strength in her left

---

[2] As the Commissioner points out in a footnote, SSR 16-3p replaced SSR 96-7p (which Sherry incorrectly cites as applicable) regarding evaluation of symptoms in disability claims. SSR 16-3p applies to determinations and decisions made on or after March 28, 2016. SSR 16-3p at *1. SSR 16-3p does not use the term "credibility." *Id.* at *2.

lower extremity to flexion and extension at ankle, her peripheral range of motion was full and without instability or laxity in all four extremities, her sensation was normal, she was alert and oriented in all spheres and displayed normal mood and judgment, her attention span and concentration were normal, her cognition and memory were grossly intact, she had normal gait, she had no focal deficits or weakness, she had intact memory, attention, and concentration, her straight leg raises were negative bilaterally, she had full range of motion of the lumbar spine, and she had fair insight.

The ALJ also considered that Sherry's medications and treatment for her various impairments included physical therapy, high doses of narcotic pain medication, joint injections, medial branch block, nonsteroidal anti-inflammatory drugs, antidepressants, a muscle relaxant, an antipsychotic, and visits to a pain clinic. The ALJ detailed Sherry's continuing psychotherapy, her hospitalization November 1-9, 2016 due to depression and suicidal ideation, her partial hospitalization from February 23, to March 8, 2017, her emergency room visits for mental and physical issues, and her rheumatology visits. He considered that Sherry reported pain at an intensity of between 7/10 and 9/10, that she said she experienced pain for 25 to 30 years, that her medication provided some pain relief, that she was unable to complete physical therapy due to pain, that injections provided some relief and others provided no relief, and that she experienced increased pain with a variety of movements (e.g., stairs, standing still). Additionally, the ALJ detailed Sherry's ongoing statements that she was depressed for various reasons and had been for the past 30 years, that she had difficulty sleeping, that she had trouble remembering, that she had morbid thoughts, and that she had problems with concentrating.

After the ALJ detailed the foregoing evidence *and more* – all of which shows very clearly that he considered all the evidence as required – the ALJ explicitly

connected the dots between that evidence and his finding that "the claimant's statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" AR 26. As for Sherry's pain complaints, the ALJ pointed out that Sherry was not taking her pain medication in September and October 2016 when she babysat her two-year-old granddaughter (in order to prevent fatigue) and therefore concluded Sherry's fibromyalgia was insufficiently treated and Sherry was willing and able to watch her granddaughter despite increased symptoms due to lack of pain medication. The ALJ further juxtaposed Sherry's statement in early June 2017 that she could not perform any household chores due to pain, yet at a medical visit on June 30, 2017, she reported mowing the lawn the day before. The ALJ explained, "[Sherry] said she developed some chest pain and shortness of breath while doing so, with resolution of symptoms with rest, but she apparently felt physically capable of performing this task, considering she chose to perform this task in the first place." AR 40. As for that instance of mowing, the ALJ further explained that it contradicted Sherry's "allegation that she was physically incapable of doing anything." *Id*. Next, the ALJ juxtaposed Sherry's "significant complaints at many medical visits" with the fact that "positive" examination findings were often limited. He highlighted: an August 15, 2016 (the day before the alleged onset date) ER record wherein the only positive findings were tenderness and slight decrease in strength to 4/5 in the left lower extremity; rheumatology visits revealed diffuse tenderness and often reduced right shoulder range of motion and bilateral knee crepitation, "but also usually normal gait, normal ability to make a fist, and no synovitis;" while physical examinations of the lumbar spine often revealed tenderness and possibly reduced range of motion, they were otherwise normal; and "[e]xaminations rarely documented any

significant neurologic findings consistent with the alleged left lower extremity neuropathy symptoms." *Id*.

The ALJ also explained the medical records during the relevant period did not substantiate Sherry's testimony about trouble holding items, taking a three to four hour afternoon nap on a regular basis, or her ability to stand or walk for only ten minutes at a time. The ALJ pointed to, respectively, evidence of full grip strength and normal manipulative abilities, Sherry's statement in September 2016 that she did not require daily naps anymore, and Sherry's alleged inability to ambulate long distances was based on her subjective allegations, examinations did not demonstrate significant difficulty with ambulation, and her treatment providers repeatedly encouraged her to be more physically active. The ALJ also noted that while Sherry reported a mixed benefit from injections overall (some provided relief, some did not), in December 2017 she reported "tremendous" benefit from trigger point injections. AR 41. The ALJ found it pertinent that Sherry was working on decreasing her use of narcotic pain medications as of December 2017. With regard to Sherry's mental health, the ALJ observed that Sherry experienced exacerbations of depression and/or anxiety at times in response to situational stressors, but the medical records indicated that psychotropic medication and counseling were beneficial. The ALJ identified Sherry's statement in August 2017 that she did not take her prescribed Xanax routinely, and in September 2017, her statement that she had not needed Xanax in a few months. The ALJ compared and contrasted the evidence throughout the Decision, and so his later discussion as to these particular discrepancies does not somehow render his subjective symptom evaluation insufficient. If anything, his analysis of these particular discrepancies later in the Decision reveals that his manner of comparing and contrasting the evidence throughout the Decision was accurate. Additionally, that analysis reveals the "weight" (as Sherry puts it) he gave to Sherry's testimony.

19

Simply put, the ALJ discussed "such relevant evidence as a reasonable mind might accept as adequate to support" his conclusion that Sherry was not disabled during the relevant period. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that in the context of administrative law, "substantial" presents a threshold for evidentiary sufficiency that "is not high"); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review"). While Sherry emphasizes the fact that she was diagnosed with fibromyalgia, an impairment which has been recognized to wax and wane and cause cognitive or memory issues, the ups and downs of her physical symptoms (whether specifically related to fibromyalgia or, more generally, her physical condition) and mental symptoms were undeniably addressed by the ALJ in his Decision. For instance, and as already discussed, the ALJ confronted the evidence of Sherry's hospitalization in November 2016 due to depression and suicidal ideation. He considered that she reported to the psychiatrist at that time that her depression has recently worsened after her daughter and granddaughter were living with her, that she was denied disability and had not been able to work for the last three years due to pain, her daughter's recent drug relapse, and her chronic low back pain. The ALJ also considered that at the time of discharge, Sherry's mood was depressed but she was alert and oriented, cooperative, displayed good eye contact, had regular speech though blunted in tone, had normal attention span and concentration, had grossly intact cognition, had good insight, had fair judgment, and had grossly intact memory. As for Sherry's partial hospitalization in early 2017, the ALJ noted that Sherry attended counseling sessions addressing her anxiety and depression related to her health issues and daughter's problems, and she made mild progress and appeared better able to manage her anxiety and depression symptoms. The ALJ noted that Sherry attended her first psychotherapy/counseling session

following the partial hospitalization program. As for Sherry's fibromyalgia, the ALJ discussed Sherry's rheumatology visits at length, the fact that evaluators assessed Sherry with cognitive impairment secondary to fibromyalgia (among other things), the symptoms her fibromyalgia appeared to cause her, and the physical activities Sherry still managed to perform and the mental tasks she still managed to engage in.

Sherry's suggestion that the ALJ improperly considered her activities of daily living is belied by the ALJ's explicit statements about how those activities factored into his ultimate conclusions. Though the ALJ observed that Sherry was willing and able to watch her granddaughter while refraining from using her pain medications, the ALJ commented that it was "sensible from a standpoint of the safety of her granddaughter" and did "not mean that she would have been capable of performing a childcare job more generally, especially as the claimant was likely willing to endure additional pain and discomfort because it was her granddaughter for whom she was caring." AR 39-40. Though the ALJ observed that Sherry said she could not perform household chores and yet reported mowing the law, "[t]he fact that she reported mowing the lawn provides no insight into her ability to sustain physical activity throughout a workday and it does not mean that performing physical activity is not painful or difficult, but it does not [sic] contradict the claimant's allegation that she was physically incapable of doing anything." AR 40. *Compare Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (noting it to be a problem when ALJs equate the ability to engage in some activities with an ability to work full-time without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation). As he was permitted to do, the ALJ considered Sherry's activities of daily living as part of his evaluation of her symptoms. *See* SSR 16-3p (providing that a claimant's daily

activities, among other things, are to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms).

The fact that the "hired guns of SSA" noted that Sherry's psychiatric symptoms except for agoraphobia "appear[ed] consistent" does not render the ALJ's subjective symptom evaluation erroneous. Plf's MSJ (Doc. 15-1 at pg. 59) (quoting AR 105). As the Commissioner argues, it was for the ALJ, not State Agency employees, to ultimately assess Sherry's subjective complaints and the State Agency psychologists concluded that Sherry could do the work described in the mental RFC finding. The Court need not delve any further into Sherry's argument that the ALJ's subjective symptom evaluation was wanting. The only thing left for the Court to consider in order to find in Sherry's favor is for it to consider the facts anew. *See Lopex ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (stating that the reviewing court considers the entire administrative record, but it does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner).

## C

Finally, Sherry posits the question: "What evidence demonstrates [her] ability to do light work on a sustained basis?" Plf's MSJ (Doc. 15-1 at pg. 62). She points to the evidence she has degenerative arthritis changes in the spine, has had multiple low back injections, findings of tenderness and limited range of motion in her back, has fibromyalgia, has bilateral knee crepitation, and had absent left ankle reflex and a plus 1 right ankle reflex at the SSA consultative examination. The Commissioner argues the ALJ based the physical RFC on the unrefuted opinions of two State Agency medical experts, Sherry presented no evidence of worse physical limitations than the RFC besides her own subjective complaints, the ALJ identified additional evidence that reasonably conflicted with her complaints of physical limitations, and Sherry's arguments regarding the ALJ's

assessment of her physical functioning again attempted to replace the medical experts' unrefuted opinions with her say-so.

As the Commissioner recognized in his brief, Sherry's challenge to the ALJ's physical RFC finding amounts to an argument that her own subjective complaints as to her physical limitations should be accepted over the ALJ's analysis of the record evidence. As discussed *supra*, the ALJ's subjective symptom evaluation was done without legal error and his findings in that regard are supported by substantial evidence. As for the evidence Sherry specifically identifies in support of her physical RFC argument, the ALJ explicitly considered that evidence. But he also considered evidence showing Sherry did not display any gait deviations, Sherry told a physical therapist she did not feel she needed therapy and that she would continue strengthening on her own, there were normal physical examination findings in the record, and March 2017 right knee x-rays revealed no radiographic abnormality of the osseus structures of the right knee but small suprapatellar joint effusion.  Further, examination showed only minimal diffuse tenderness, examination revealed bilateral knee crepitus without definite effusion or instability, straight leg raising tests were negative bilaterally, Sherry was able to bear weight and ambulate without any ambulatory aids, she had no specific motor weakness or muscle atrophy, Sherry's lower extremity strength was difficult to assess secondary to limited effort, and she had 5/5 handgrip strength and could perform fine and gross manipulations with both hands.  Such evidence, coupled with the ALJ's subjective symptom evaluation and the State Agency doctors' opinions that Sherry could perform light work amounts to substantial evidence to support the ALJ's physical RFC finding. Moreover, the ALJ's consideration of all that evidence provided the requisite narrative discussion of the record evidence. *See* SSR 96-8p ("An RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific

medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)"); *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). In other words, the ALJ's narrative discussion is the answer to Sherry's posited question.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 15) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 19) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Sherry L.H., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on June 10, 2021.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE